## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 1:11-CR-0151-01 |
| | : | |
| v. | : | (Chief Judge Conner) |
| | : | |
| OLUFEMI ADIGUN | : | |

### MEMORANDUM

Presently before the court is convicted defendant Olufemi Adigun's ("Adigun") amended motion (Doc. 221) for a new trial.  Adigun asserts that a new trial is warranted because (1) the court erred in denying Adigun's objection under *Batson v. Kentucky*, 476 U.S. 79 (1986); (2) the court erred in denying Adigun's request for a "missing witness" instruction; and (3) the jury's verdict was against the weight of the evidence.  For the following reasons, the court will deny the motion.

### I.   Background

The government's prosecution of Adigun is the result of a complex fraud and money laundering scheme that partially relied on Adigun's services as a Western Union and MoneyGram agent to transfer and launder profits from various mass marketing consumer fraud schemes.  On April 27, 2011, Adigun was first indicted on one count of conspiracy to commit mail fraud, wire fraud, and money laundering. (Doc. 7).  A superseding indictment followed on August 24, 2011, which charged Adigun with one count of conspiracy to commit mail and wire fraud (Count 1), one count of mail fraud (Count 2), eight counts of wire fraud (Counts 3-10), twenty counts of engaging in unlawful monetary transactions in criminally derived

property (Counts 11-30), and one count of conspiracy to commit money laundering (Count 31).  (Doc. 29).

Adigun's first trial commenced on May 7, 2012, and ended on May 17, 2012. On May 15, 2012, the court dismissed Count 14 on the government's motion and Counts 16, 19, and 26 on defendant's motion.  (Doc. 121).  The jury ultimately acquitted Adigun of Counts 2-15, 17, and 30 but was hopelessly deadlocked on Counts 1, 18, 20-25, 27-29, and 31.  (Doc. 96).  The court declared a mistrial on these counts.  (Doc. 123).

On June 6, 2012, the government filed a notice of intention to retry the remaining counts.  (Doc. 102).  On December 12, 2012, the government filed a second superseding indictment against Adigun and two co-defendants, Uchechukwu Stanley Ohiri ("Ohiri"), and Benjamin Chikwe ("Chikwe").  (Doc. 134). The indictment charged Adigun with one count of conspiracy to commit mail and wire fraud (Count 1), ten counts of engaging in unlawful monetary transactions in criminally derived property (Counts 18, 20-25, 27-29), one count of conspiracy to commit money laundering offenses (Count 31), seven counts of engaging in unlawful monetary transactions over $10,000 in criminally derived property (Counts 34-40), and five counts of money laundering (Counts 51-55).  Chikwe ultimately pleaded guilty to conspiracy to commit money laundering offenses pursuant to a plea agreement requiring his full cooperation.  (Docs. 166-172).  Ohiri remains at large.

Adigun's second jury selection and trial commenced on July 15, 2013.  Adigun was represented by John A. Abom, Esquire ("defense counsel"), throughout the trial.  On July 18, 2013, the court dismissed counts 20, 21, 23-25, 27-29, 34, and 35 on the government's motion.  (Id. at 59).  The jury convicted Adigun on the remaining 14 counts on July 19, 2013.  (Doc. 200).  On August 2, 2013, Adigun filed a motion for a new trial and motion for enlargement of time to amend the motion for a new trial and file a brief in support.  (Doc. 207).  The court granted Adigun's motion for enlargement of time to file amended post-trial motions until no later than 30 days after receipt of the trial transcripts.  (Doc. 209).  Adigun filed the instant, timely amended motion for new trial on October 16, 2013.  (Doc. 221).  This motion is fully briefed and ripe for disposition.

A.    **Batson** Objection

During jury selection, the government exercised a peremptory challenge against a potential alternate juror, Juror 32, a 59-year-old African-American woman.  (Doc. 214 at 96).  Defense counsel challenged the government's strike as racially discriminatory under Batson v. Kentucky, 476 U.S. 79 (1986).  (Id.)  The government proffered several neutral reasons for its peremptory challenge: (1) the potential juror was an employee of the Commonwealth of Pennsylvania, and the government was concerned with her potential "liberal" viewpoint; (2) the potential juror recently relocated from Pittsburgh to Harrisburg; (3) the potential juror was a clerk typist and the government preferred to place a more educated potential alternate juror, Juror 30, who was a pharmacist.  (Id. at 96-97).  A short discussion

followed, and then the government added "and the other reason, Your Honor, she's also a woman, and we feel that we're looking for male jurors[, who] tend to be stronger leaders in the jury room[.  This is] another reason why we've opted to keep the first two.  She was the very last one of the four." (Id. at 98).

Crediting the government's first three reasons for the strike, the court determined that the government proffered non-racial reasons for his peremptory challenge. (Id. at 98-100).  Defense counsel never objected on the record to the government's gender-based explanation.  The parties completed jury selection and trial commenced.

At the end of the first day of trial, the court noted on the record that, pursuant to the Supreme Court's holding in J.E.B. v. Alabama, 511 U.S. 127 (1994), intentional discrimination on the basis of gender in the use of peremptory strikes violates the Equal Protection Clause.  (Id. at 225-27).  Citing Gattis v. Snyder, 278 F.3d 222 (3d Cir. 2002), the court also noted that the strike of a juror motivated in part by an impermissible reason – such as gender – may nevertheless be valid if the party demonstrates that it would have taken the same action in the absence of the impermissible motivation.  (Id. at 227).  The court noted that the government offered the gender-related reason for the strike at the end of the explanation, "almost as an after thought," and only after the government tendered the potential alternate juror's low educational level, employment, and recent relocation to the area.  (Id.)  The court specifically found that the government would have struck the potential alternate juror even in the absence of any gender-related reason and that

4

the government's impermissible gender-based consideration was "strictly *de minimus*." (Id. at 227-28).  Defense counsel did not place any objection on the record after the court's determination.[1]

## B.    Evidence Introduced at Trial

During trial, the government set forth substantial evidence implicating Adigun's involvement in perpetuating mass market consumer fraud schemes. Testimonial and documentary evidence introduced at trial shows that beginning in early November 2007, Adigun became the owner/operator of FAB Tax Services in Houston, Texas.  (Doc. 215 at 257-311; Govt's Exhs. 18, 20.3).  The business was headquartered in an empty storefront at 10876 Westheimer Drive.  (Id.)  According to the building's landlord and two witnesses who worked next door, FAB was never open for business and had no customers.  (Doc. 215 at 292-95; Doc. 216 at 87-114). Adigun became both a Western Union and MoneyGram money transfer agent in the following months.  (Govt's Exhs. 9, 10, 75).  Adigun was also the only person who maintained signature authority over all three of FAB's bank accounts at Capital One, Bank of America, and Washington Mutual Banks.  (Govt's Exhs. 40, 41, 42, 194).

From December, 2007 to September, 2008, FAB handled over $3 million sent through the MoneyGram and Western Union money transfer systems.  (Govt's Exhs. 5, 7, 176, 181).  The money was sent to FAB by over 1,000 fraud victims from

---

[1] Adigun would have had standing to object on the basis of gender even though he is male.  See Taylor v. Louisiana, 419 U.S. 522 (1975).

5

the United States and Canada.  (Id.)  To process the payouts, Adigun, Ohiri, and

Chikwe created numerous false payee identifier information, including false Texas

drivers' license numbers, names, and addresses.  (Govt's Exhs. 5, 7).  Not a single

payout in this nine month period was a legitimate transaction.  (Id.)

Much of the proceeds were converted into cash.  (Govt's Exhs. 52, 146-149,

175, 187).  Adigun personally converted over $1 million of the Western Union and

Moneygram proceeds into cash.  (Govt's Exhs. 174, 197).  To convert the proceeds,

Adigun personally issued more than 600 handwritten Western Union money

transfer checks payable to FAB instead of the intended payee and then deposited

the funds into FAB's Bank of America account.  (Govt's Exh. 77).  Adigun also made

203 individual cash withdrawals from 17 different bank branches between February

20, 2008 and September 8, 2008.  (Govt's Exhs. 208, 212, 215).  Notably, on August 11,

2008, Adigun withdrew $72,000 in cash from five separate bank transactions.  (Id.)

Adigun also transferred over $500,000 of the proceeds to other accounts controlled

by Chikwe and other suspected co-conspirators.  (Govt's Exhs. 6.3, 202, 204, 205,

206, 211).  Additionally, approximately $600,000 was sent offshore to Canada,

Nigeria, and Romania via the Western Union and MoneyGram money transfer

systems.  (Govt's Exhs. 6.2, 214).

Western Union and MoneyGram closed FAB for fraudulent activities in

August, 2008, but Adigun continued laundering checks drawn against accounts

controlled by other corrupt Houston area MoneyGram agents.  (Govt's Exh. 213).

He subsequently deposited checks totaling $25,300 from other corrupt agents into

his personal check account.  (Govt's Exhs. 140-143, 177).

### C.    Missing Witness Jury Instruction

Shortly before the close of testimony, on July 18, 2013, defense counsel

submitted a proposed "missing witness" jury instruction, based on the Third

Circuit's Model Criminal Jury Instruction 4.16.[2]  Defense counsel argued that

Adigun's co-defendant, Chikwe, would have provided important testimony but was

only available as a witness to the government and not to the defense.  (See Doc. 188

at 3-4).  Defense counsel requested the court to instruct the jury that it was

permitted, but not required, to infer that Chikwe's testimony would have been

unfavorable to the government.  (Id.)  Defense counsel explained that he didn't

---

[2] Adigun's requested missing witness jury instruction reads:

> You have heard evidence about [Chikwe], who has not been called to testify.  The defense has argued that [Chikwe's] testimony could have been important to this case and that [Chikwe] was available as a witness only to the government and not to the defense.
> If you find that the government could have called [Chikwe] as a witness and that [Chikwe] would have given important new testimony, and you also find that [Chikwe] was available as a witness only to the government and not to the defense and that the government failed to call [Chikwe], you are permitted, but you are not required, to infer that [Chikwe's] testimony would have been unfavorable to the government.
> You must decide whether you believe that [Chikwe] would have testified unfavorably to the government.  You should not draw such a conclusion if the witness was equally available to both parties or if the witness' testimony would have merely repeated the testimony of other witnesses or evidence already presented in the case.

(Doc. 188 at 3-4).

know "if the facts would support it yet," but he submitted the proposed jury instruction because Chikwe would most likely invoke his Fifth Amendment right against self-incrimination if defense counsel called him to testify.  (Doc. 217 at 7).

The court closed the record shortly thereafter and held a charge conference with the parties to discuss proposed jury instructions.  Defense counsel did not object to the court's omission of the missing witness jury instruction from the court's charge.  At the end of the conference, the court asked defense counsel if he was no longer asking for a missing witness jury instruction.  (Id. at 246).  Defense counsel stated, "I'm not asking.  I understand I didn't establish a record the way it unfolded.  I realized that you've not given it."  (Id. at 246-47).

The court responded "[l]et me just address it squarely and allay any concerns that you may have."  (Id. at 247).  The court explained that it did not find the instruction to be warranted, citing several Circuit Courts of Appeals cases holding that the missing witness instruction should not be given when a witness who may otherwise testify would invoke their Fifth Amendment privilege, even when the government has the ability to grant immunity.  (Id. at 247-48).  The court cited the following cases: United States v. Raphael, 487 F. App'x 490, 499 (11th Cir. 2012); United States v. Rios, 636 F.3d 168, 171-72 (5th Cir. 2011); United States v. Myerson, 18 F.3d 153, 157-58 (2d Cir. 1994); United States v. Saint Michael's Credit Union, 880 F.2d 579, 597 (1st Cir. 1989); Morrison v. United States, 365 F.2d 521, 524 (D.C. Cir. 1966).  (Id.)  After this discussion, Adigun's counsel confirmed that Chikwe would

plead his Fifth Amendment right against self-incrimination if defense counsel called him to testify.  (<u>Id.</u> at 249).

## II.   <u>Legal Standard</u>

Pursuant to Rule 33 of the Federal Rules of Criminal Procedure, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a).  Granting a Rule 33 motion is within the sound discretion of the district court, and it must evaluate the motion without viewing the evidence favorably to the government and instead must "exercise[] its own judgment in assessing the Government's case."  <u>United States v. Johnson</u>, 302 F.3d 139, 150 (3d Cir. 2002).  When reviewing a motion for a new trial based on a "weight of the evidence" argument, a district court may order a new trial only if the court "believes that 'there is a serious danger that a miscarriage of justice has occurred – that is, that an innocent person has been convicted.'"  <u>United States v. Brennan</u>, 326 F.3d 176, 189 (3d Cir. 2003) (internal citations omitted).

Motions for a new trial are generally subject to the harmless and plain error provisions found in Federal Rule of Criminal Procedure 52.  When the court employs a harmless error analysis, it must disregard "[a]ny error, defect, irregularity, or variance that does not affect substantial rights."  FED. R. CRIM. P. 52(a).  If counsel does not properly object during trial, alleged errors are subject to plain error review.  <u>United States v. Olano</u>, 507 U.S. 725, 731-32 (1993).  Plain error exists when there is an "error" that is "plain" and that "affects substantial rights." FED. R. CRIM. P. 52(b).  A "plain" error is one which is "clear" or "obvious."  <u>Olano</u>,

9

507 U.S. at 734.  To affect substantial rights, the error must have been "prejudicial,"

or it "must have affected the outcome of the District Court proceedings."  Id.

Structural errors may "affect substantial rights" under a plain error analysis

regardless of their actual impact on the trial.  See United States v. Marcus, 560 U.S.

258, 263 (2010); Johnson v. United States, 520 U.S. 461, 468-69 (1997).  Under the

plain error standard, the court should only reverse "particularly egregious errors"

that "seriously affect the fairness, integrity or public reputation of judicial

proceedings."  Virgin Islands v. Knight, 989 F.2d 619, 632 (3d Cir. 1993) (internal

quotation omitted).

## III.   Discussion

Adigun asserts that a new trial is warranted because (1) the court erred in

denying Adigun's Batson objection; (2) the court erred in denying Adigun's request

for a "missing witness" instruction; and (3) the jury's verdict on all counts was

against the weight of the evidence.  The court will address each issue in turn.

### A.     Batson Objection

Adigun asserts that he is entitled to a new trial pursuant to Batson v.

Kentucky, 476 U.S. 79 (1986) due to the government's peremptory challenge of

Juror 32.[3]  The Court in <u>Batson</u> held that the Equal Protection Clause of the

Fourteenth Amendment prohibits racial discrimination in the use of peremptory

challenges.  The Supreme Court later extended <u>Batson</u>'s protections to gender

discrimination in <u>J.E.B. v. Alabama</u>, 511 U.S. 127 (1994).

Under <u>Batson</u>, defense counsel must first make a *prima facie* showing that

the prosecutor exercised a peremptory challenge on an unconstitutionally

discriminatory basis – such as on the basis of race or gender.  <u>Hernandez v. New</u>

<u>York</u>, 500 U.S. 352, 358-59 (1991).  If defense counsel succeeds in making a *prima*

*facie* case, the burden shifts to the government to articulate non-discriminatory

---

[3] Defense counsel did not object to the government's gender-based reason for the strike at the time it was proffered or after the court discussed its impermissibility.  (Doc. 214 at 98, 225-29).  Thus, it is not clear that defense counsel properly amended or preserved his <u>Batson</u> objection as it pertains to gender-based discrimination.  However, the court need not consider whether harmless error or plain error review applies because it committed no error in denying Adigun's <u>Batson</u> objection.

Moreover, the court need not discuss whether Adigun was prejudiced by the strike even though no alternate juror ever joined the deliberating jury.  A <u>Batson</u> violation is considered a "structural" error which defies harmless error analysis.  Ramseur v. Beyer, 983 F.2d 1215, 1225 n.6 (3d Cir. 1992) ("It should be noted that harmless error analysis is inappropriate in cases involving discrimination in the jury selection process."); see also United States v. Harris, 192 F.3d 580, 588 (6th Cir. 1999); Ford v. Norris, 67 F.3d 162, 170-71 (8th Cir. 1995).  But see Carter v. Kemna, 255 F.3d 589, 592 (8th Cir. 2001) (discussing disagreement among courts concerning whether a Batson violation requires reversal of a conviction for an improperly excluded alternate juror who never deliberated); <u>United States v. Canoy</u>, 38 F.3d 893, 899 n.6 (7th Cir. 1994) (same).  Similarly, structural errors may "affect substantial rights" under a plain error analysis regardless of their actual impact on the trial.  See United States v. Marcus, 560 U.S. 258, 263 (2010); Johnson v. United States, 520 U.S. 461, 468-69 (1997); United States v. Vazquez, 271 F.3d 93, 102-103 (3d Cir. 2001) (noting that structural defects are not subject to harmless error or plain error analysis).

reasons for the strike.  Id.  Ultimately, the trial court must determine whether the government engaged in purposeful discrimination.  Id. at 369-72.  The court must examine all the evidence and surrounding circumstances and determine whether the government's proffered reasons for the strike are pretextual and whether it acted with discriminatory intent.  Coombs v. DiGuglielmo, 616 F.3d 255, 261-62 (3d Cir. 2010).

If the government's strike is motivated by both discriminatory and non-discriminatory reasons, the strike may still be valid if the government demonstrates that it would have taken the same action in the absence of the impermissible motivation.  Gattis v. Snyder, 278 F.3d 222, 233 (3d Cir. 2002); see also United States v. Douglas, 525 F.3d 225 (2d Cir. 2008); King v. Moore, 196 F.3d 1327 (11th Cir. 1999); United States v. Darden, 70 F.3d 1507 (8th Cir. 1995).  In the face of an apparent Batson violation, a new trial may be warranted.  See Harrison v. Ryan, 909 F.2d 84, 88 (3d Cir. 1990).  However, an appellate court must accept the trial court's Batson decision unless it is clearly erroneous.  Hernandez, 500 U.S. at 365-69; United States v. DeJesus, 347 F.3d 500, 507 (3d Cir. 2003).

Adigun asserts that a new trial is warranted because the government's stated preference for male jurors was facially discriminatory.  (Doc. 222 at 2-3).  Adigun further argues that, due to this facially discriminatory reason, Gattis' "mixed motive" analysis requires the government to show "that the strike would have been taken even in absence of prohibited considerations of *race and gender*."  (Id. at 3) (emphasis added).  The government cited Juror 32's modest education and

12

employment by the Commonwealth of Pennsylvania as reasons for the strike.  (Id.)
Adigun explains that, of the four available alternate jurors, both Juror 32 and 31
were of comparable age and education, and both worked for the Commonwealth of
Pennsylvania.  (Id.)  The only difference between the two jurors was race and
gender.  (Id.)  Adigun contends that, to satisfy Gattis, the government "must have
shown a reason why Juror 32 would have been struck instead of Juror 31 had Juror
32 also been a Caucasian male."  (Id.)

　　　　Preliminarily, Adigun's argument erroneously obfuscates the need for Gattis'
"mixed motive" analysis for *both* race and gender discrimination.  An analysis
under Gattis is warranted as it pertains to the government's *gender*-based
explanation for the strike, but Adigun fails to establish that the government's
peremptory challenge was at all motivated by Juror 32's *race*.  Education,
employment, and place of residence are all facially neutral grounds for the exercise
of a peremptory challenge.  See, e.g., United States v. Anthony, 458 F. App'x 215 (3d
Cir. 2012) (employment); Cuffee v. Dover Wipes Co., 163 F. App'x 107 (3d Cir. 2006)
(employment); Forrest v. Beloit Corp., 424 F.3d 344, 351 (3d Cir. 2005) (employment
and residence); United States v. Uwaezhoke, 995 F.2d 388 (3d Cir. 1993)
(employment and residence).  During jury selection, the court examined all of the
evidence and surrounding circumstances to determine that these three reasons
were not pretext for racial discrimination and that the government did not engage
in purposeful discrimination on the basis of race.  (Doc. 214 at 98-100).  The court
finds no reason, and Adigun offers none, to disturb this decision.

Thus, the court must still employ <u>Gattis</u>' "mixed-motive" analysis, but only to determine whether the government still would have struck Juror 32 absent its impermissible gender-based motivation.  During jury selection, the court specifically found that the government offered the gender-related reason for his strike "almost as an after thought" and that the government would have struck Juror 32 even if she was male.  (Doc. 214 at 227-28).  Two of the potential alternate jurors were male.  Juror 30 was a 50 year old pharmacist and Juror 31 was a highway maintenance worker for the Pennsylvania Turnpike Commission.  (Doc. 183).  The government specifically explained that it preferred Juror 30 over Juror 32 because of Juror 30's superior educational background.  (<u>Id.</u> at 97).  Juror 31 and 32 shared similar educational backgrounds and employment for the Commonwealth of Pennsylvania, but the government also cited the fact that Juror 32 had recently relocated to the area from Pittsburgh.  (Id. at 96).  The court concludes that the government would have struck Juror 32 regardless of its impermissible gender-based motivation.

Pursuant to Batson, the government did not engage in an unconstitutional peremptory challenge on the basis of race.  Pursuant to Batson and Gattis, the government would have struck Juror 32 regardless of its impermissible gender-based motivation.  The court did not err and a new trial is not warranted on this ground.

### B.    Missing Witness Jury Instruction

Adigun next requests a new trial based on the court's failure to provide a missing witness instruction.  The determination of whether to provide a specific jury instruction lies within the trial judge's discretion.  <u>See</u> <u>United States v. Leahy</u>, 445 F.3d 634, 642 (3d Cir. 2006) (internal citation omitted).  Any error in the charge must be considered in the context of the jury charge as a whole.  <u>Id.</u> (internal citation omitted).

A missing witness jury instruction may be appropriate when the government fails to call a witness that the government would ordinarily produce if the witness would testify in its favor.  <u>United States v. Ariza-Ibarra</u>, 651 F.2d 2, 15-16 (1st Cir. 1981).  In that situation, a jury could reasonably infer that the government failed to call the absent witness because the absent witness' testimony would have been unfavorable to the government.  <u>Id.</u>; <u>see, e.g.</u>, <u>United States v. Hines</u>, 470 F.2d 225 (3d Cir. 1972) (finding that the facts did not justify an inference that a witness' testimony would have been unfavorable to the government's case, explaining that "[o]ften all that can be inferred is that the witness' testimony would not have been *helpful* to a party, not that the testimony would have been adverse" (emphasis in original)); <u>United States v. Restaino</u>, 369 F.2d 544 (3d Cir. 1966) (holding that the court properly refused to charge a missing witness jury instruction because there was no evidence that the testimony of co-defendants would ordinarily favor the government); <u>United States v. Jackson</u>, 257 F.2d 41 (3d Cir. 1958) (finding that it

15

was proper for defense counsel to argue in summation that the government did not

call an informant as a witness).

A missing witness jury instruction may also be appropriate when the

government fails to call a material witness that was peculiarly available to it or

within its exclusive control, regardless of any showing of the favorability of the

witness' testimony.  United States v. Torres, 845 F.2d 1165, 1169-71 (2d Cir. 1988);

Ariza-Ibarra, 651 F.2d at 15-16.  Such an instruction is not appropriate when the

witness is equally available to both parties.  United States v. Vastola, 899 F.2d 211,

235 (3d Cir. 1990) *vacated on other grounds by* 497 U.S. 1001 (1990).

Adigun asserts that the government possessed the exclusive ability to call

Chikwe because Chikwe had entered into a plea agreement with the government

that required his full cooperation.  (Doc. 222 at 5).  Adigun further claims that

Chikwe would have invoked his privilege against self-incrimination if Adigun had

attempted to call him.  (Id.)  Adigun attempts to distinguish this case from the

numerous cases holding that a missing witness instruction should not be provided

when the government refuses to immunize a witness claiming their Fifth

Amendment privilege.  See United States v. Raphael, 487 F. App'x 490, 499 (11th

Cir. 2012); United States v. Rios, 636 F.3d 168, 171-72 (5th Cir. 2011); United States

v. Myerson, 18 F.3d 153, 157-58 (2d Cir. 1994); United States v. Saint Michael's

Credit Union, 880 F.2d 579, 597 (1st Cir. 1989); Morrison v. United States, 365 F.2d

521, 524 (D.C. Cir. 1966).  Adigun explains that the government's ability to compel

16

Chikwe's testimony is due to the cooperation clause in Chikwe's plea agreement, not due to the government's ability to grant immunity.

Preliminarily, the court notes that neither party presented, and the court was unable to find, any Third Circuit precedent or any case law in any circuit that squarely addresses this factual scenario.  However, there are two non-precedential opinions from the Fourth Circuit that address a trial court's refusal to provide a missing witness instruction when the government failed to call a co-defendant who had pleaded guilty pursuant to a plea agreement requiring his cooperation.  In United States v. Graves, __ F. App'x __, Crim. A. No. 12-4179, 2013 WL 5931285, (4th Cir. Nov. 6, 2013), the appellant's co-defendant pleaded guilty and entered into a plea agreement with the government whereby he agreed to testify truthfully if called.  The Fourth Circuit reasoned that the witness was not unavailable to the defense simply because he cooperated with the government and also held that it was "of no moment" that the co-defendant may have invoked his Fifth Amendment privilege if called by the defense.  2013 WL 5931285 at *9-10.  In United States v. Rukaj, 23 F.3d 404, *3 (4th Cir. 1994), the court similarly reasoned that a witness is not unavailable to the defense simply because he cooperates with the government under a plea agreement and may invoke his Fifth Amendment privilege against testifying.  As set forth below, the court is persuaded by this reasoning.

Moreover, numerous decisions have held that a missing witness jury instruction is not warranted simply because a witness pleaded guilty or is cooperating with the government.  See, e.g., United States v. Eberhart, 467 F.3d

17

659, 664-65 (7th Cir. 2006); <u>United States v. Spinosa</u>, 982 F.2d 620, 632-33 (1st Cir.

1992); <u>United States v. Keplinger</u>, 776 F.2d 678, 701-703 (7th Cir. 1985).  Similarly,

several cases have generally held that a witness' invocation of his Fifth Amendment

privilege does not require a missing witness jury instruction because such an

invocation renders the witness unavailable to both parties.  <u>See, e.g.</u>, <u>United States</u>

<u>v. Dellasera</u>, 457 F. App'x 876 (11th Cir. 2012); <u>United States v. Simmons</u>, 663 F.2d

107 (D.C. Cir. 1979); <u>Bowles v. United States</u>, 439 F.2d 536, 541-42 (D.C. Cir. 1970).

On the other hand, in <u>United States v. Boston</u>, 194 F. App'x 890, 893 (11th Cir.

2006), the court noted that if the witness' plea agreement contained a cooperation

agreement, it could be considered an indication that she was pragmatically

unavailable to the defendant due to bias and hostility against him.  However,

without such a cooperation agreement, the court reasoned that the witness was not

peculiarly available to the government because she could have still invoked her

Fifth Amendment privilege against self-incrimination if called to testify.  <u>Id.</u>; <u>see</u>

<u>also</u> <u>United States v. Kojayan</u>, 8 F.3d 1315, 1322-23 (9th Cir. 1993) (while analyzing a

claim for prosecutorial misconduct, indicating that if the government had disclosed

the cooperation agreement with the witness, the trial court may have provided

defense counsel's requested missing witness instruction to the jury); <u>United States</u>

<u>v. McElwee</u>, Crim. A. No. 08-269, 2010 WL 235007 (W.D. La. Jan. 15, 2010) (affirming

the district court's instruction to the jury that no inference should be drawn against

the government for their failure to call a co-defendant because the co-defendant's

plea agreement did not require her to cooperate during trial or prevent her from

testifying on behalf of the defendants, either party was able to subpoena her, and she could have invoked her Fifth Amendment privilege under questioning from either party).

The court finds that the government does not exercise exclusive control over a co-defendant simply because he has entered into a cooperation agreement, even if the co-defendant has indicated that he would invoke his Fifth Amendment right against self-incrimination if called to testify by the defense.  The government could not compel Chikwe's testimony pursuant to the plea agreement.  Had the government called him, Chikwe was still entitled to invoke his Fifth Amendment privilege.  The government's remedies for such a breach would be limited to other remedies, such as a request to be relieved of its obligations under the plea agreement.  In this regard, Chikwe's contractual obligation to testify would be no different than his obligation to testify under a subpoena or a grant of immunity: there are sanctions for failing to testify, but the witness is certainly not within the government's exclusive control.

Moreover, the court was loath to provide this instruction in the absence of any showing or assertion that defense counsel actually wished for Chikwe to testify. See Torres, 845 at 1170 (citing United States v. Bramble, 680 F.2d 590, 592 (9th Cir. 1982) (stating that courts are often reluctant to find that a witness is unavailable to the defense when it appears that the defense is not actually interested in calling the witness to the stand, but instead is simply attempting to obtain a missing witness charge).  Indeed, the government alleges that, based on Chikwe's interview reports,

which were provided to defense counsel prior to trial, Chikwe's testimony would have placed Adigun directly at the center of the money laundering conspiracy. (Doc. 238 at 11).

Even if the court's refusal to provide the instruction was an abuse of its discretion, it is subject to plain error review. Federal Rule of Criminal Procedure 30(d) requires a party to object to the court's failure to give a requested instruction by informing the court of the specific objection and the grounds for the objection before the jury retires to deliberate. The mere request of a specific instruction, without a clearly articulated objection to the court's subsequent refusal to provide it, is not sufficient. See Virgin Islands v. Knight, 989 F.2d 619, 631 (3d Cir. 1993). If the party fails to object, any error is only subject to plain error review pursuant to Rule 52(b). FED. R. CRIM. P. 30(d). In the case *sub judice*, defense counsel requested a proposed missing witness jury instruction (see Doc. 188), but during the charge conference, defense counsel did not address the court's omission of the proposed instruction in its charge. When the court asked if he was no longer asking for the missing witness jury instruction, defense counsel appeared to waive his earlier request by indicating that he is "not asking" for the missing jury instruction and explaining that "I understand I didn't establish a record the way it unfolded." (Doc. 217 at 246-47). Defense counsel also did not raise the objection after the court finished instructing the jury. (See Doc. 213 at 48 ("We have nothing, Your Honor.")).

Thus, the court's omission of the missing witness jury instruction is subject to plain error review.  The justifications for applying this heightened standard are readily apparent: the court had no notice that defense counsel's request for the instruction was based upon Chikwe's cooperation agreement with the government. The record was unclear as to whether Chikwe would have only invoked his Fifth Amendment privilege if called by the defense or whether he was also unwilling to testify on behalf of the government.  Had counsel articulated his objection at the time of the charge conference or after the court's instruction, the court could have endeavored to develop the record concerning the government's reasons for not calling Chikwe, the potential content of Chikwe's testimony, and whether he was willing to testify for the government but not the defense.

In light of the uncertain nature of the case law concerning this topic, and the undeveloped record, any error on behalf of the court in refusing the instruction was certainly not "clear" or "obvious."  Olano, 507 U.S. at 734.  Nor did any alleged error on this ground affect Adigun's substantial rights, particularly in the face of the overwhelming evidence introduced against him.  See United States v. Henries, 98 F. App'x 164 (3d Cir. 2004) (holding that any error in district court's denial of missing witness instruction was harmless because the evidence against the defendant was overwhelming).  It defies credulity to suggest that a missing witness instruction would have somehow affected or changed the outcome of the trial.  The court will not grant a new trial on this ground.

### C.    Weight of the Evidence

Lastly, Adigun contends that his conviction on the remaining 14 counts was against the weight of the evidence.  For count 1, conspiracy to commit mail fraud and wire fraud, Adigun contends that there was no direct evidence that Adigun entered into an agreement to commit an unlawful act, or that Adigun knew of the conspiracy's illicit purpose.  (Doc. 222 at 6-7).  For Counts 18, 22, and 26-40, unlawful monetary transactions, Adigun asserts that the circumstantial evidence introduced regarding his knowledge of the unlawful nature of the monetary transactions did not support a verdict beyond a reasonable doubt.  (Id. at 7).  Finally, for Counts 31 and 51-55, money laundering and conspiracy to commit money laundering, Adigun alleges that there was no direct evidence that he knew he was handling the proceeds of unlawful activity or that the transactions were designed to conceal the nature, location, source, ownership, or control of the unlawful proceeds.  (Id. at 7-8).  He also asserts that there was no evidence to establish a money laundering conspiracy, or that Adigun and others distributed the proceeds of unlawful activities to other individuals.  (Id.)

Adigun's arguments are unavailing.  At trial, the government introduced substantial testimonial and documentary evidence establishing Adigun's involvement in transferring and laundering profits from various mass marketing consumer fraud schemes.  Based on the empty storefront, the lack of legitimate transactions, and the falsified payee identifier information, there is no indication that Adigun was a legitimate Western Union and MoneyGram agent.  The

government even presented evidence that Adigun personally converted over $1 million of the ill-gotten proceeds into cash by issuing money transfer checks and making substantial individual cash withdrawals.  Adigun helped transfer funds to other accounts controlled by Chikwe and other co-conspirators, and a substantial amount of money was transferred offshore to Canada, Nigeria, and Romania.  It is easy to infer Adigun's knowledge of the illicit nature of his activities from this overwhelming amount of evidence.  There is absolutely no danger that the jury convicted an innocent person in this case.  A new trial is not warranted.

## IV.   Conclusion

For the foregoing reasons, the court will deny Adigun's amended motion (Doc. 221) for a new trial.  An appropriate order follows.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania


Dated:      February 19, 2014